**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,    )
                              )
    **Plaintiff,**        )
                              )
    **v.**                  ) No. 4:15-CR-00404-HEA
                              )
ADRIAN LEMONS,            )
                              )
    **Defendant.**      )

**PLEA HEARING**

**BEFORE THE HONORABLE HENRY E. AUTREY**
**UNITED STATES DISTRICT JUDGE**

**MAY 3, 2019**

APPEARANCES:

For Plaintiff:      Erin O. Granger, Esq.
                    Thomas S. Rea, Esq.
                    OFFICE OF THE U.S. ATTORNEY
                    111 South 10th Street, 20th Floor
                    St. Louis, MO 63102

For Defendant:      Daniel J. Bruntrager, Esq.
                    BRUNTRAGER AND BILLINGS
                    225 S. Meramec Ave., Suite 1200
                    St. Louis, MO 63105

                    Kathryn B. Parish, Esq.
                    CARLYLE PARISH, LLC
                    3407 Jefferson, Suite 128
                    St. Louis, MO 63118

Reported By:        REAGAN A. FIORINO, RMR, CRR, CSR, CCR
                    Official Court Reporter
                    United States District Court
                    111 South 10th Street, Eighth Floor
                    St. Louis, MO 63102 | (314)244-7989

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

|    |                                                           |
|----|-----------------------------------------------------------|
| 1  | <u>MAY 3, 2019</u>                                        |
| 2  | (The proceedings commenced at 11:31 a.m.)                 |
| 3  | **THE COURT:**  Good morning, all.                        |
| 4  | This is the matter of United States of America            |
| 5  | versus Adrian Lemons, also known as "AD" or "D",          |
| 6  | Case No. 4:15-CR-404-HEA.                                  |
| 7  | The matter is now before the Court on notice of           |
| 8  | change of plea and the parties have provided to the Court a |
| 9  | document entitled Guilty Plea Agreement which consists of 19 |
| 10 | pages.                                                     |
| 11 | I'll let the record further reflect that the              |
| 12 | defendant is now present in open court with counsel,      |
| 13 | Mr. Bruntrager; and the Government is present through     |
| 14 | Ms. Granger.                                               |
| 15 | Mr. Bruntrager, on behalf of Defendant, are you           |
| 16 | ready to proceed?                                          |
| 17 | **MR. BRUNTRAGER:**  Yes.  And, Your Honor, also present  |
| 18 | with me has been my co-counsel throughout this matter Kay |
| 19 | Parish.                                                    |
| 20 | **THE COURT:**  Ms. Parish, good to have you.             |
| 21 | Ms. Granger, are you ready to proceed?                    |
| 22 | **MS. GRANGER:**  I am, Your Honor.  And also present     |
| 23 | for the United States Attorney's Office is Thomas Rea.    |
| 24 | **THE COURT:**  Mr. Rea.                                  |
| 25 | **MR. REA:**  Good morning, Your Honor.                   |

1          **THE COURT:**  Is there an announcement at this time,

2    Mr. Bruntrager?

3          **MR. BRUNTRAGER:**  Your Honor, pursuant to extensive

4    negotiations and discussions with the Government, I have been

5    authorized by Mr. Lemons to withdraw the former plea of not

6    guilty that was alleged in the last indictment and enter a

7    plea to the one remaining count or what we anticipate will be

8    the one remaining count of Count 19.  We enter a plea of

9    guilty to that count.

10          **THE COURT:**  Very well.

11          Will you swear in the defendant.

12                      **ADRIAN LEMONS,**

13    having been first duly sworn in by the clerk, testified:

14                      **EXAMINATION**

15    **BY THE COURT:**

16    Q.   Would you state your full name for the record, please.

17    A.   Adrian Lemont Lemons.

18    Q.   Mr. Lemons, did you hear the statement that I made when

19    we started this proceeding about why we were here?

20    A.   Yes, sir.

21    Q.   All right.  And did you hear your attorney's response to

22    that statement?

23    A.   Yes, sir.

24    Q.   And is that a correct statement of why we are here today?

25    A.   Yes, sir.

1   Q.   Okay.  So you understand that there are some questions I

2   have to ask you before I accept your plea of guilty to

3   determine whether your plea of guilty is valid.  Okay?  So as

4   we go through this process, if I say something that you don't

5   hear, let me know and I'll speak louder.  If I say something

6   and you don't understand me, let me know that and I'll repeat

7   it or rephrase it so that you can.  And if at any time you

8   want to talk with your lawyer regarding any matters here, let

9   me know that and I'll give you that opportunity.  All right?

10  A.   Yes, sir.

11  Q.   All right.  Also keep in mind you have taken an oath to

12  answer all of these questions truthfully which means your

13  failure to do that could cause the United States to come back

14  against you with a new indictment for perjury.  All right?

15  A.   Yes, sir.

16  Q.   Any questions about any of that?

17  A.   No.

18  Q.   How old are you, Mr. Lemons?

19  A.   Forty-one.

20  Q.   And how far in school have you gone?

21  A.   Twelfth grade, high school equivalency.

22  Q.   When did you get your GED?

23  A.   In 2009.

24  Q.   Very good.

25       Do you have any difficulty hearing?

1    A.    No, sir.

2    Q.    Do you have any difficulty speaking or understanding

3    English?

4    A.    No, sir.

5    Q.    Have you taken any medication before coming to court

6    today that might keep you from understanding what's going on

7    in court today?

8    A.    No, sir.

9    Q.    Have you used any alcohol or drugs before coming to court

10   today?

11   A.    No, sir.

12   Q.    Have you used any alcohol or drugs within the last 36

13   hours?

14   A.    No.

15   Q.    Have you ever been treated for having or diagnosed as

16   having any type of mental illness or mental disease?

17   A.    No.

18   Q.    Have you ever used or taken any type of medication that

19   might typically be used to treat mental illness or mental

20   disease?

21   A.    No.

22   Q.    How are you feeling today, Mr. Lemons?

23   A.    Feeling all right I guess.

24   Q.    All right.  In your own words tell me why you've come to

25   court today.  What do you want to do about your case?

1  A.    I came to court today because I feel that this would be

2  the best solution of the case considering, I guess, everything

3  surrounding the case.

4  Q.    All right.  So in that regard, do you want to plead

5  guilty today?

6  A.    Yes, sir.

7  Q.    All right.

8          **THE COURT:**  Do you know of any reason,

9  Mr. Bruntrager, why the Court should not conclude that your

10 client is competent to proceed at this time?

11          **MR. BRUNTRAGER:**  I know of no reason, Your Honor.

12          **THE COURT:**  Ms. Granger?

13          **MS. GRANGER:**  No, Your Honor.

14          **THE COURT:**  Let the record then reflect that on

15 examination of Defendant and inquiry of counsel, the Court

16 concludes that the defendant is competent to proceed at this

17 time.  Having done so, the Court will proceed with its review

18 of the requirements relating to pleas of guilty and sentencing

19 in this court under Local Rule 13.05.

20          **(Pursuant to Local Rule 13.05, a bench conference**

21 **was held on the record and placed under seal, after which the**

22 **following proceedings continued in open court:)**

23 Q.    (By The Court)  Having done so, Mr. Lemons, have you had

24 an opportunity to discuss your case and review it with your

25 lawyer?

 1    A.    Yes, sir.

 2    Q.    And do you feel that you've had sufficient time to review

 3    your case and talk about it with your lawyer?

 4    A.    Yes, sir.

 5    Q.    And has your lawyer given you advice regarding your case?

 6    A.    Yes, sir.

 7    Q.    Are you satisfied with all of the advice that he has

 8    given you in the case?

 9    A.    Yes, sir.

10    Q.    Has he answered all of your questions for you fully,

11    completely and to your satisfaction?

12    A.    Yes, sir.

13    Q.    Is there anything at all that you need to know about your

14    case that you are still confused about?

15    A.    No, sir.

16    Q.    Is there anything about your case that you still don't

17    understand?

18    A.    No, sir.

19    Q.    Were there any witnesses that you wanted your lawyer to

20    contact or that he should have contacted but did not contact

21    for you?

22    A.    No, sir.

23    Q.    Was there any investigation that you wanted your lawyer

24    to do for you or that he should have done for you that he did

25    not do?

1   A.    No, sir.

2   Q.    Was there any information that you wanted your lawyer to

3   get from the Government regarding your case or that he should

4   have gotten from the Government regarding your case that he

5   didn't get?

6   A.    No, sir.

7   Q.    Was there anything at all that you wanted your lawyer to

8   do for you in this case that he has failed to do or refused to

9   do on your behalf?

10  A.    No, sir.

11  Q.    Are you fully satisfied with all the work that your

12  lawyer has done for you?

13  A.    Yes, sir.

14  Q.    Do you have any complaints against your lawyer about

15  anything as your attorney in this case?

16  A.    No, sir.

17  Q.    And do you understand, Mr. Lemons, that when you plead

18  guilty here today, it means you are giving up your right to a

19  trial by a jury?

20  A.    Yes, sir.

21  Q.    Do you understand that the constitution and laws of this

22  nation guarantees you the right to have your case decided by a

23  jury of 12 impartial citizens?

24  A.    Yes, sir.

25  Q.    And did you talk about all of that with your lawyer?

 1   A.    Yes.

 2   Q.    As a result of that discussion, have you now concluded

 3   that you do, in fact, want to give up your right to a trial by

 4   jury and plead guilty here today?

 5   A.    Yes, sir.

 6   Q.    All right.  Do you understand, though, that if you did go

 7   to trial you would be presumed innocent and it would be the

 8   obligation of the United States to prove you guilty beyond a

 9   reasonable doubt by competent evidence?

10   A.    Yes, sir.

11   Q.    Do you further understand that you would not be required

12   to present any evidence to prove yourself innocent?

13   A.    Yes, sir.

14   Q.    You also understand that if you were to go to trial in

15   this matter, you would have the opportunity to confront any

16   and all witnesses that the Government might have against you?

17   A.    Yes, sir.

18   Q.    In that regard, do you understand that you would then be

19   able to cross-examine those witnesses as they testified in

20   this court under oath and in front of a jury?

21   A.    Yes, sir.

22   Q.    Do you further understand that at trial you have the

23   ability to object to any and all evidence that the United

24   States might attempt to introduce against you at the trial?

25   A.    Yes, sir.

1    Q.   And you further understand that if there was some

2    evidence that you wanted to present in your own defense you

3    could, but there is no requirement that you present any

4    evidence for any purpose since the burden is always on the

5    Government to prove you guilty beyond a reasonable doubt?

6    A.   Yes, sir.

7    Q.   You further understand that if you were to go to trial,

8    you have the ability to testify or not to testify?

9    A.   Yes, sir.

10   Q.   And you understand that if you decided that you did not

11   want to testify in the trial, Mr. Lemons, the fact that you

12   did not testify cannot be used by anyone for any purpose?

13   A.   Yes, sir.

14   Q.   Any questions about any of this so far?

15   A.   No, sir.

16   Q.   All right.  You also understand that if you go forward

17   with your plea of guilty here today and if I accept your plea

18   of guilty, I will enter a judgment finding you guilty beyond a

19   reasonable doubt and impose a sentence on some future date?

20   A.   Yes, sir.

21   Q.   And do you understand that whatever sentence I impose is

22   entirely up to me?

23   A.   Yes, sir.

24   Q.   And do you understand that that is true, even though you

25   might have some agreement between yourself and the Government

1   on things that relate to sentencing?

2   A.   Yes, sir.

3   Q.   And, finally, do you understand that when you plead

4   guilty here today, it means you are giving up your right to

5   not incriminate yourself under the Fifth Amendment of the

6   Constitution because you will have to admit the facts that

7   establish a basis for the crime as well as admit the crime

8   itself?

9   A.   Yes, sir.

10   Q.   And is that what you want to do today?

11   A.   Yes, sir.

12   Q.   In relation to the charges that bring you here today,

13   have you had the opportunity to review the indictment and

14   discuss it with your lawyer?

15   A.   Yes, sir.

16   Q.   As a result of that review, are you satisfied that you

17   understand everything in the indictment?

18   A.   Yes, sir.

19   Q.   Do you have any questions about anything in the

20   indictment?

21   A.   No, sir.

22   Q.   Are you also aware of the range of punishment that

23   applies to the charges in the indictment?

24   A.   Yes, sir.

25   Q.   And did you talk to your lawyer about that as well?

*Plea Hearing*                                                                          12

1   A.    Yes, sir.

2   Q.    Do you have any questions regarding the range of

3   punishment?

4   A.    No.

5          **THE COURT:**  Ms. Granger, for the record, what is the

6   applicable range of punishment in this matter?

7          **MS. GRANGER:**  The maximum possible penalty provided

8   by law for the offense charged in Count 19 to which the

9   defendant is pleading guilty is imprisonment of not more than

10  life, a fine of not more than $10 million or both such

11  imprisonment and fine.  Additionally, the Court shall impose a

12  period of supervised release or not less than four years.

13  There is a mandatory minimum term of imprisonment of not less

14  than ten years for that count and a 100-dollar special

15  assessment fee.

16  Q.    (By The Court)  Did you hear everything that Ms. Granger

17  just said?

18  A.    Yes, sir.

19  Q.    And is there anything that Ms. Granger just said that

20  surprised you in any way?

21  A.    No.

22  Q.    All right.  Is anybody forcing you to plead guilty today?

23  A.    No, sir.

24  Q.    Has anyone threatened you to compel you to plead guilty?

25  A.    No, sir.

1   Q.   Has anyone promised you anything in exchange for your

2   plea of guilty?

3   A.   No, sir.

4   Q.   Has anybody made any threats against any close friends or

5   family members to compel you to plead guilty today?

6   A.   No, sir.

7   Q.   Have any of your close friends or family members or

8   associates forced you to plead guilty today for some reason?

9   A.   No, sir.

10   Q.   Are you then pleading guilty voluntarily and of your own

11   free will because that's what you want to do in this case?

12   A.   Yes, sir.

13   Q.   All right.  Now, when we started out here today,

14   Mr. Lemons, I made a reference to the Guilty Plea Agreement.

15   And page 19 of that Guilty Plea Agreement has your name in

16   print, and there's a signature above the printed name.

17   A.   Uh-huh.

18   Q.   Is that your signature?

19   A.   Yes, sir.

20   Q.   And before signing the document, did you review it in its

21   entirety with your lawyer --

22   A.   Yes, sir.

23   Q.   -- and talk about it in detail with him?

24   A.   Yes, sir.

25   Q.   And as a result of that review and discussion, are you

1    satisfied that you understand everything in the plea

2    agreement?

3    A.    Yes, sir.

4    Q.    Are there any questions at all that you have regarding

5    anything that's set out in the plea agreement?

6    A.    No, sir.

7    Q.    All right.  I'm going to have Ms. Granger tell us what

8    the substance of the plea agreement is as it relates to the

9    rights and obligations of the parties, so listen carefully.

10   When she's finished, I will have some additional questions for

11   you.  And then after that we will talk about the facts in the

12   case a little bit.  All right?

13   A.    Okay.

14             **THE COURT:**  All right.  Ms. Granger.

15             **MS. GRANGER:**  Thank you, Your Honor.

16             Pursuant to Rule 11(c)(1)(C) of the Federal Rules of

17   Criminal Procedure, in exchange for the defendant's voluntary

18   plea of guilty to the offense of conspiracy to distribute

19   5 kilograms or more of a mixture or substance containing

20   cocaine, which is charged in Count 19 of the fifth superseding

21   indictment, the Government would agree to dismiss Counts 20,

22   22, 23, 24, 25 and 26 at the time of sentencing.

23             The Government expressly reserves the right to

24   pursue charges of the defendant relating to any crimes of

25   violence, including but not limited to, any violation of

1    Title 18, United States Code, Section 924 involving the use or

2    discharge of a firearm in furtherance of a drug trafficking

3    offense and the use of a firearm in furtherance of a drug

4    trafficking offense resulting in death, even if said offense

5    or offenses are a part of the drug trafficking conspiracy

6    charged in this case, accessory after the fact, and

7    obstructive-type conduct.

8         The Government agrees to waive the filing of a

9    criminal information seeking enhanced punishment pursuant to

10   Title 21, United States Code, Section 851.

11        In addition, pursuant to Rule 11(c)(1)(C) of the

12   Federal Rules of Criminal Procedure, the parties agree that

13   the defendant's sentence should be 240 months in the Bureau of

14   Prisons.  The parties further agree that neither party may

15   request a sentence above or below the joint sentencing

16   recommendation as set forth.

17        If the Court informs the parties prior to sentencing

18   that it will reject this agreement or sentences the defendant

19   to a sentence not in conformity with this agreement, then

20   either party may withdraw from the plea agreement pursuant to

21   Rule 11(c)(5).

22        There is also an agreement as to some of the

23   guideline calculations, and that begins on page 12 of the

24   agreement.  Specifically, the parties agree as to Count 19 of

25   the fifth superseding indictment the parties recommend that

1    the base offense level is found in Section 2D1.1.  The parties

2    agree that the base offense level as to Count 19 is 36

3    pursuant to 2D1.1.

4         The parties agree that the quantity of a mixture or

5    substance for which the defendant is accountable, including

6    relevant conduct, is at least 150 kilograms of cocaine but

7    less than 450 kilograms.  The parties recommend that two

8    levels should be added under 2D1.1(b)(12) because the

9    defendant maintained a premise for the purpose of

10   manufacturing or distributing a controlled substance.

11        The parties disagree with that the following

12   specific offense characteristics should apply.  That would be

13   the two levels pursuant to 2D1.1(b)(1) because a dangerous

14   weapon was possessed.

15        The parties also agree on certain adjustments.

16   First, the parties recommend that three levels be added

17   pursuant to 3B1.1(b), as the defendant was a manager or

18   supervisor, and the criminal activity involved five or more

19   participants or was otherwise extensive.

20        The parties recommend that three levels should be

21   deducted pursuant to 3E1.1(a) and (b) for acceptance of

22   responsibility.

23        The Government estimates that the total offense

24   level is 40 and the defendant estimates the total offense

25   level is 38, unless the defendant is a career offender.

1        The determination of the defendant's criminal

2   history is going to be left to the Court.  Either party may

3   challenge before and at sentencing the finding of the

4   presentence report as to the defendant's criminal history and

5   applicable category.

6        The defendant's criminal history is known to the

7   defendant and is substantially available in the pretrial

8   services report.

9        There are also some appellate waivers in effect,

10  Your Honor.  With respect to non-sentencing issues, the

11  parties waive all rights to appeal all non-jurisdictional,

12  non-sentencing issues, including but not limited to, any

13  issues related to pretrial motions, discovery in the guilty

14  plea, the constitutionality of the statutes to which the

15  defendant is pleading guilty, and whether the defendant's

16  conduct falls within the scope of the statute.

17       With respect to sentencing issues, the parties

18  disagree as to whether the two levels should be added pursuant

19  to 2D1.1B1 and will litigate this issue at sentencing.

20       The parties agree to abide by the district court's

21  determination of that issue and specifically waive their

22  rights to appeal the district court's -- resulting in the

23  calculation of the total offense level.

24       In the event that the Court accepts the plea and at

25  sentencing the defendant follows the jointly recommended

1   sentencing agreement as set forth in paragraph 2 of this

2   agreement, as part of the agreement, the parties waive all

3   rights to appeal all sentencing issues.  Both parties reserve

4   the right to appeal any determination of the defendant's

5   career offender status.

6           Lastly, Your Honor, there is a forfeiture provision

7   that is set forth on page 17.  As to the forfeiture items that

8   are set forth in the forfeiture allegation of the indictment,

9   the United States will file a preliminary order of forfeiture

10  as to each item 14 days prior to sentencing.  Defendant

11  reserves the right to file a written objection to that

12  preliminary order of forfeiture seven days prior to

13  sentencing.

14          As to any item which the parties can not resolve on

15  the issue of forfeiture, the parties agree to litigate the

16  issue before the Court at the time of sentencing.  Defendant

17  specifically reserves his right to contest forfeiture of the

18  items in the forfeiture allegation under Federal Rule of

19  Criminal Procedure 32.2, Your Honor, and that is the substance

20  of the guilty plea.

21  Q.   (By The Court)  Did you hear all those things as stated

22  by Ms. Granger?

23  A.   Yes, sir.

24  Q.   And is there anything that Ms. Granger just said that you

25  had not heard or were not aware of or came as a surprise to

1    you in any way?

2    A.   No, sir.

3    Q.   All right.

4            **THE COURT:**  The Court will then approve of the plea

5    agreement as outlined on the record.

6            Ms. Granger, tell us, if you would, what the

7    evidence would have been if the matter had gone to trial that

8    would establish a factual basis for the charge, the relevant

9    conduct of Defendant, and the basis upon which one might

10   conclude Defendant guilty beyond a reasonable doubt.

11           **MS. GRANGER:**  Thank you, Your Honor.

12           The parties agree that the following would have been

13   proven beyond a reasonable doubt had this case proceeded to

14   trial:

15           Between 2012 and 2016, investigators conducted an

16   investigation into the Velazquez/Lemons drug trafficking

17   organization for the distribution of cocaine in the Eastern

18   District of Missouri.  Between 2012 and 2016, in the Eastern

19   District of Missouri and elsewhere, Defendant Adrian Lemons --

20   hereinafter Lemons -- conspired with Jose Alfredo Velazquez,

21   Juan Ramon Garza, Luis Fernando Cantu, Jose Eduardo Cavazos,

22   and others, to commit the offense of conspiracy to distribute

23   5 kilograms or more of a mixture or substance containing a

24   detectable amount of cocaine.

25           Jose Alfredo Velazquez and his associates supplied

1    large quantities of cocaine to Lemons and his associates in

2    the St. Louis area.  Lemons in turn supplied a large number of

3    large-scale, mid-level and street-level drug dealers who sold

4    cocaine and cocaine base within the St. Louis area.

5            These individuals included defendant Maurice "Blue"

6    Woodson, Anthony Jordan, Virgil Sims, Isaiah "Skeet" Love,

7    Jr., and Craig Walker, among others.

8            Co-defendant Jose Velazquez coordinated routine bulk

9    shipments of cocaine from Reynosa, Mexico through the Rio

10   Grande Valley, and then to the St. Louis, Missouri area.

11           Juan Garza, Luis Cantu, and others, acted as

12   facilitators in the St. Louis area receiving routine shipments

13   of cocaine, normally transported via truck, and in turn,

14   shipping bulk quantities of United States currency back

15   through the southern United States to Mexico as payment for

16   the cocaine.

17           The facilitators received the bulk quantities of

18   cocaine for delivery to Adrian Lemons and his associates who,

19   in turn, supplied several other high-level dealers in drug

20   trafficking organizations operating within the St. Louis area

21   and Missouri.

22           Typical cocaine shipments were generally not less

23   than 20 kilograms.  Conversely, shipments of United States

24   currency delivered as part of the conspiracy as consideration

25   for the cocaine typically were hundreds of thousands of

1    dollars.

2         During the course of the overall investigation,

3    agents seized in excess of 64 kilograms of cocaine,

4    approximately over $1.3 million in United States currency

5    attributable to Lemons and his associates.

6         Lemons owned and utilized multiple properties in

7    furtherance of the drug trafficking conspiracy.  Among those

8    properties were:  1600 McLaran, 8573 Broadway, 877 Wall,

9    824 McLaran and 7118 Idlewild.

10        On February 3, 2014, Homeland Security in Texas

11   furthered an independent investigation into the

12   tractor-trailer shipment of bulk quantities of cocaine

13   destined for the United States.  Specifically, investigators

14   in Southern Texas seized approximately 30 kilograms of cocaine

15   being sent to Terry Gilliam and destined for St. Louis,

16   Missouri.

17        February 6, 2014, HSI and DEA St. Louis Divisions

18   conducted enforcement operations related to the seized

19   cocaine, feigning a delivery to Terry Gilliam, one of the

20   members of the organization responsible for this St. Louis,

21   Missouri distribution point.  Eventually Lemons was also a

22   member.

23        During the operation, agents seized approximately

24   $138,000 in U.S. currency; and in this were two bundles of

25   currency labeled "38" and "42".  Subsequent to the successful

1   feigned delivery of imitation cocaine, investigators executed

2   a search warrant at 7230 North Broadway, which was operated by

3   Terry Gilliam, among others, and recovered items including

4   approximately 14 kilograms of cocaine, a money counter, a

5   vacuum sealer, vacuum bags, and a Ruger .40 caliber pistol.

6          Terry Gilliam would routinely use this stash

7   location at 7230 North Broadway to receive bulk shipments of

8   cocaine ranging from 15 to 75 kilograms per shipment from

9   Velazquez.  After Gilliam's arrest, additional routine

10  shipping points were used for cocaine deliveries and currency

11  shipments, including but not limited to the property at

12  6327 Theodosia, which was operated by Lemons.

13         The investigative team developed information that

14  led to the above-mentioned period of court-authorized

15  intercepts involving Lemons in August 2014.  Investigators

16  conducted a comprehensive investigation that included

17  surveillance during periods of this time, which ultimately led

18  to the discovery of some drug ledgers in the investigation.

19         On or about August 25, 2014, Lemons and his

20  associates received in excess of approximately 15 kilograms of

21  cocaine in a delivery facilitated by Velazquez, Garza, Cantu

22  and others in a manner typical of the conspiracy.

23  Investigators were aware that Lemons was in possession of that

24  load of cocaine.

25         On August 25, 2014, Dwayne Rainey met with Lemons at

1   a stash house located at 7118 Idlewild in St. Louis to receive

2   cocaine following intercepted communications between them.

3   That same day, St. Louis County Police Department executed a

4   vehicle stop of Rainey following his departure from Lemons at

5   7118 Idlewild.  When approaching Rainey to obtain

6   identification, the St. Louis City -- or County Police

7   Department officer observed a black bag in the passenger's

8   seat of the truck.  During the course of the traffic stop, the

9   officer returned to his vehicle and shortly thereafter

10  reapproached Rainey's vehicle.

11          Before the officer could make contact with Rainey,

12  Rainey then fled at a high rate of speed and succeeded in

13  evading the arrest at that time.  The abandoned truck was

14  located shortly thereafter and was subsequently impounded.

15  The black bag previously observed by the officer who made the

16  initial stop was missing.

17          Intercepted communications revealed that Rainey

18  called Lemons who was utilizing target telephone No. 3 and

19  said "Boys jumped on me as soon as I left."  Lemons then asked

20  Rainey, "You make it out?"  And Rainey replied, "I had to

21  throw."  Rainey threw cocaine from his possession as he fled

22  from the police.

23          A K-9 positively alerted on the truck which

24  indicated the presence of drugs and a search of the truck

25  revealed numerous suspected drug ledgers.  In these ledgers,

1  the initials "AD" was labeled next to suspected drug ledger

2  entries.  The initials "TT" and "AD" and the word "me" also

3  appeared next to references to kilogram quantities of

4  controlled substances.  Investigators know from Title III

5  interceptions of that phone that Lemons' street name is "AD"

6  and Anthony Jordan's street name is "TT."

7          In October of 2014, investigators identified Juan

8  Garza as a St. Louis coordinator of drug shipments for

9  Velazquez.  On October 27, 2014, investigators initiated

10 surveillance at the residence of Garza and at least one other

11 facilitator, both of whom were coordinators known to Velazquez

12 to oversee operations in St. Louis.

13         During the surveillance investigators observed Garza

14 and other facilitator depart from the residence and drive to

15 Bank of America.  Investigators observed Garza exit the

16 vehicle, enter the Bank of America.  They were later able to

17 determine a deposit of $8,000 in United States currency was

18 made by Garza to an account held in Pharr, Texas.

19         On November 10, 2014, investigators established

20 surveillance on Lemons.  Investigators intercepted a call

21 between Demetrius O'Neal and Lemons.  Based on the call,

22 investigators believed that Lemons and O'Neal would be meeting

23 to conduct a transaction.  Investigators conducted

24 surveillance and observed a vehicle parked in front of

25 824 McLaran.  O'Neal exited the vehicle and stood in front of

 1   the front door of 824 McLaran.

 2          At approximately 5:59 p.m., O'Neal called Lemons

 3   right back and said "I'm at the door," meaning 824 McLaran.

 4   O'Neal then exited the residence approximately 20 minutes

 5   later and departed in the area followed by surveillance units.

 6   Surveillance observed O'Neal pull into Christy's gas station

 7   which is located on Hall Street and enter the store.

 8          Investigators detained O'Neal as he exited the gas

 9   station.  O'Neal denied that the Cadillac belonged to him.

10   Officers conducted a search of the vehicle based on probable

11   cause that O'Neal purchased drugs from Lemons inside McLaran.

12          Officers discovered a large amount of suspected

13   cocaine hidden beneath an article of clothing in the backseat

14   of the vehicle.  Laboratory analysis revealed the presence of

15   cocaine with a gross weight of 705.41 grams.

16          On November 10, 2014, Rainey following O'Neal's

17   arrest contacted Lemons.  In a court-authorized intercept,

18   Rainey stated to Lemons that "they pulled him over, grabbed

19   his lunch" in reference to O'Neal and cocaine.  Rainey further

20   explained to Lemons that they "let him go."

21          These intercepts were followed by a flurry of phone

22   calls during the evening of November 10, 2014, between Lemons

23   and Rainey setting up a meeting to discuss the law enforcement

24   contact with O'Neal and the law enforcement contacts with

25   various individuals on November 10, 2014.  The meeting and

1    communications between Rainey and Lemons following the seizure

2    from O'Neal, a member of the conspiracy, are consistent with

3    the leadership/management role of Lemons.

4            In December 2014, the McAllen Resident Agency of the

5    San Antonio Division of the FBI developed information relative

6    to the transportation of bulk shipments of cocaine to various

7    United States cities at the direction of Jose Perez-Cortez.

8    This included bulk shipments of cocaine to 6327 Theodosia.

9    Investigators knew from following Garza in St. Louis in the

10   fall of 2014 that 6327 Theodosia Avenue was a suspected

11   location for the importation of drugs into St. Louis for the

12   Velazquez/Lemons DTO.

13           On February 3, 2015, surveillance at or near

14   McAllen, Texas observed Jose Eduardo Aguirre-Cavazos driving a

15   Honda.  Investigators conducted investigation and discovered

16   that he had inserted 20 individual kilograms of cocaine, each

17   of which was wrapped with black tape, into the trap located in

18   a tractor vehicle.

19           FBI McAllen seized the suspected cocaine.

20   Subsequent laboratory testing revealed it to be approximately

21   21.9 kilograms of cocaine.  Thereafter, agents conducted a

22   controlled delivery of imitation cocaine to 6327 Theodosia,

23   resulting in arrests and seizures of U.S. currency and drug

24   distribution notations.

25           Within that same general time frame, investigators

1    were monitoring judicially-authorized Title III intercepts

2    consistent with the anticipated cocaine delivery to

3    6327 Theodosia.

4            On February 4, 2015, earlier in the evening, Lemons,

5    using target telephone 5, was intercepted texting Velazquez.

6    From toll analysis, investigators knew that Garza and Lemons

7    communicated with Velazquez.  Based upon toll analysis,

8    investigators believed prior to the interception of

9    communications of target telephone 5 used by Lemons, that

10   Velazquez was overseeing the importation of cocaine into

11   St. Louis with Lemons and Garza/Cantu; thus, investigators

12   concluded that Velazquez was the point of contact for the

13   cocaine source of supply for the Lemons DTO.

14           On February 5, 2015, Velazquez was intercepted

15   speaking with Lemons about the 20 kilograms of cocaine to be

16   delivered on February 6, 2015.  At approximately 9:33 p.m.,

17   Velazquez texted Lemons on target telephone 5, "My sister,"

18   meaning cocaine, "is close to you."  From this intercept

19   Velazquez referred to the bulk cocaine shipment seized in

20   McAllen and destined for St. Louis as organized by Cortez

21   previous in the week, the seizure of drug ledgers and bank

22   slips on February 6, 2015.

23           On February 6, 2015, investigators in St. Louis

24   conducted a controlled delivery of imitation cocaine to the

25   address of 6327 Theodosia Avenue being the business location

1   of Miller Auto Sales in a known location for the importation

2   of cocaine for Velazquez/Lemons DTO.

3          Prior to delivering the imitation cocaine, Garza and

4   Cantu dropped off several items to include $570,245 in U.S.

5   currency at 6327 Theodosia to Clarence Miller, a mechanic that

6   worked at the business.  Following the delivery, investigators

7   executed a search warrant and arrested Miller at that address

8   after he had begun removing the imitation cocaine from the

9   vehicle.

10          Investigators also detained Garza and Cantu during a

11   vehicle stop.  Investigators seized 57 individually wrapped

12   bundles of U.S. currency, each of which was wrapped with black

13   tape, totaling $570,245 from 6327 Theodosia Avenue.  The black

14   bundles of U.S. currency were labeled individually "1" through

15   "57."

16          At 11:48 a.m., Velazquez called Lemons on target

17   telephone 5 and asked, "The boys," meaning Garza and Cantu,

18   "have been working."  Velazquez then asked, "They already in

19   the house," in reference to 7118 Idlewild.  Lemons replied, "I

20   don't know.  They ain't call me."  Velazquez then told Lemons

21   to call the shop and find out.  Lemons then texted Velazquez,

22   "Bad bro."  One minute later, Velazquez called Lemons.  Lemons

23   said, "It ain't good."  Lemons then said, "They," in reference

24   to police, "all over there man."  Velazquez said, "I still got

25   some check over there in the house," in reference to money at

1   7118 Idlewild.  Velazquez then said to Lemons, "Let me find

2   out if we can do with the check at the house 'cause I need to

3   pick 'em up," which Lemons responded, "You ain't listen to

4   what I'm say'n.  The people at the house," in reference to the

5   police.

6              On February 6, 2015, Garza consented to a search at

7   7118 Idlewild Avenue, the residence of Garza and Cantu, where

8   $305,380 in U.S. currency was seized, bringing the cumulative

9   total of United States currency seized in the St. Louis

10  enforcement operation on February 6, 2015 to $875,625.

11             Significantly, during the consent search of the

12  Garza/Cantu residence, agents also seized additional notes

13  which constitute drug ledgers.  The Cryptanalysis and

14  Racketeering Records Unit of the FBI laboratory examined the

15  documents seized and concluded that the documents contained

16  notations of an illicit drug distribution business, including

17  previous shipments of cocaine and United States currency.

18             The analysis concluded, in part, that notations

19  found on some of the items are consistent with the receipt of

20  "white packages," believed to be slang reference to kilogram

21  quantities of cocaine.  Moreover, the analysis revealed

22  notations consistent with the movement of money.

23  Specifically, the records identified packages of ten dollars,

24  which is believed to be consistent with monetary bundles of

25  $10,000.  Investigators believe that the totality of the

1    evidence, specifically the packaging and seizures of the money

2    in 10,000-dollar increments support this conclusion.

3              On January 13, 2016, investigators executed a search

4    warrant at 1155 -- 11553 Poeggemoeller,

5    P-O-E-G-G-E-M-O-E-L-L-E-R, a residence in St. Louis which is

6    the primary residence of Lemons.  During the search of that

7    residence, investigators locate Lemons, who was taken into

8    custody.  They recovered evidence, including but not limited

9    to two safes in a crawl space in the basement, one of which

10   contained $245,492.53, a loaded .40 caliber pistol in the

11   garage cabinet, drug distribution notes, and a handwritten

12   note including the following language.  It was a reference to

13   a public storage.  There was also drug notations that

14   contained a list of conspirators and debts owed to Lemons.

15   Agents also seized a BMW automobile at the time of the search.

16             In total, although the amount of cocaine

17   attributable to the defendant Adrian Lemons is difficult to

18   calculate with precision, the parties are in agreement that

19   based upon the known evidence and including relevant conduct

20   as well as the conduct of co-defendants reasonably foreseeable

21   to him, Defendant Lemons is accountable for not less than

22   150 kilograms of cocaine.  More specifically, multiple

23   cooperating witnesses have stated that the total amount of

24   cocaine for which Lemons is responsible exceeds 450 kilograms.

25             Expert testimony in the event of trial would

1    establish that this amount of cocaine is an amount that is

2    inconsistent with an amount purely for personal use and is

3    consistent with the amount possessed for distribution.

4            **THE COURT:**  Thank you, Ms. Granger.

5    Q.    (By The Court)  Did you hear all of those facts stated by

6    Ms. Granger, Mr. Lemons?

7    A.    Yes, sir.

8    Q.    And are all those facts true and correct?

9    A.    Pretty much.  I mean, yes, it's -- the facts from

10   February 14, at that present time, I wasn't in the jointly

11   undertaking with Terry Gilliam, but besides all of that,

12   everything else was consistent.

13           **THE COURT:**  Ms. Granger.

14           **MS. GRANGER:**  I am not sure which part he is talking

15   to, Your Honor.  Which page?

16           **THE COURT:**  What page are you talking about?

17           **THE DEFENDANT:**  It was page 4.

18           **THE COURT:**  Okay.

19           **THE DEFENDANT:**  Page 4.

20           **THE COURT:**  Beginning with the paragraph "On

21   February 3, 2014."

22           **THE DEFENDANT:**  Yeah, the 7230 North Broadway.  I

23   wasn't in the jointly undertaking with Terry and Velazquez at

24   that time.

25           **MS. GRANGER:**  Your Honor, I believe the sentence

 1   "eventually Lemons was also a member" covers any concerns.

 2           **THE DEFENDANT:**  Right, yeah, yeah, yeah.  Right.  I

 3   mean, those are facts.  I was just -- yeah, those -- yeah.

 4   That's correct, sir.  I was just making it clear that Lemons

 5   became jointly undertaken with Velazquez later after this

 6   incident.

 7           **THE COURT:**  Okay.  I gotcha.  Ms. Granger, any

 8   issues?

 9           **MS. GRANGER:**  No, Your Honor.

10   Q.   (By The Court)  Having said that, Mr. Lemons, did you,

11   along with two or more persons, reach an agreement or come to

12   an understanding between 2012 and January 13, 2016 to

13   distribute a mixture or substance containing a detectable

14   amount of cocaine?

15   A.   Yes, sir.

16   Q.   Did you knowingly and voluntarily join in the agreement

17   or understanding either at the time it was first reached or at

18   some later time while it was still in effect?

19   A.   Yes, sir.

20   Q.   And at the time that you joined any agreement or

21   understanding, did you know of its illegal purpose?

22   A.   Yes, sir.

23   Q.   And finally, was the amount of mixture or substance

24   containing a detectable amount of cocaine involved in the

25   offense and attributable to you by virtue of your own conduct

1   5 kilograms or more?

2   A.    Yes, sir.

3   Q.    How do you plead to the charge?

4   A.    Guilty.

5           **THE COURT:**  Do you know of any reason,

6   Mr. Bruntrager, why I should not accept your client's plea of

7   guilty?

8           **MR. BRUNTRAGER:**  I know of no reason, Your Honor.

9           **THE COURT:**  Ms. Granger?

10          **MS. GRANGER:**  No, Your Honor.

11          **THE COURT:**  Let the record then reflect that the

12   Court will enter its order, judgment and findings that the

13   defendant is entering his plea of guilty knowingly,

14   voluntarily and of his own free will, with full understanding

15   of the nature and consequences of his plea of guilty; and,

16   furthermore, that he is knowingly and voluntarily waiving his

17   right to a trial by a jury and all rights incident thereto.

18   Further finding that the defendant is fully cognizant to the

19   range of punishment applicable to the charge, the Court

20   accepts Defendant's plea of guilty and enters its judgment

21   finding Defendant guilty beyond a reasonable doubt.

22          A presentence investigation report will be ordered.

23   Sentencing will be set for July 31 at 2:00 in the afternoon.

24          Anything else, Mr. Bruntrager?

25          **MR. BRUNTRAGER:**  Judge, I would ask if Ms. Parish

1    and I can approach to talk to you at the sidebar, please.

2              **THE COURT:**  Do we need a record?

3              **MR. BRUNTRAGER:**  No, I don't.

4              **MS. PARISH:**  I don't think we need a record.

5              Can we put headphones on him so he can hear what we

6    are talking about, if possible?

7              (Counsel approached the bench and an off-the-record

8    discussion was held as well as the following discussion:)

9              **MR. BRUNTRAGER:**  Ms. Granger reminded us there is

10   something we need to put on the record very briefly.  That is

11   that we -- that he has authorized us to waive the filing of

12   any pretrial motions prior to the plea of guilty this morning.

13   Mr. Lemons has.

14             **THE COURT:**  Okay.  All right.  That's it for the

15   record.

16             (Further discussions were held off the record.)

17             (The proceedings returned to open court.)

18             **THE COURT:**  Anything else, Mr. Bruntrager?

19             **MR. BRUNTRAGER:**  No, sir, nothing else.

20             **THE COURT:**  All right.  Mr. Lemons, we will see you

21   back on July 31 at 2:00 in the afternoon, then.

22             **THE DEFENDANT:**  Okay.  Thank you.

23             **THE COURT:**  That will conclude this proceeding.

24             (The proceedings concluded at 12:14 p.m.)

25

<u>CERTIFICATE</u>

I, Reagan A. Fiorino, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 34 inclusive and was delivered electronically and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 1st day of July, 2019.


*/s/ Reagan A. Fiorino*
Reagan A. Fiorino, CRR, RMR, CCR, CSR
Official Court Reporter